UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JUSTIN BENOIT,<br><br>Defendant. | Criminal No. 3:22-30014-MGM |

MEMORANDUM AND ORDER REGARDING MOTION TO SUPPRESS
(Dkt. No. 47)

February 29, 2024

MASTROIANNI, U.S.D.J.

I. Introduction

Defendant, Justin Benoit, moves to suppress statements made to law enforcement on February 15, 2022. He points out the Massachusetts State Police ("MSP") had a warrant to search 160 Second Street, Pittsfield, Massachusetts ("160 Second Street" or "160") and his person. He further argues the MSP violated his Fourth Amendment rights by entering his apartment at 158 Second Street ("158 Second Street" or "158") without a warrant rendering any subsequent incriminating statements inadmissible. Regardless of the lawfulness of the initial entry, Defendant contends the MSP violated his Fifth Amendment rights three times, separately justifying suppression of each of his incriminating statements. In his telling, Lieutenant Thomas Forest ("Lieutenant Forest") elicited incriminating information without giving a proper *Miranda* warning in 158's living room. Lieutenant Forest and Trooper Traylen Chalmers ("Trooper Chalmers") collectively coerced Defendant to waive his *Miranda* rights leading him to incriminate himself for a second time in his mother's kitchen. Trooper Chalmers then committed the third *Miranda* violation by ignoring an unambiguous invocation of the right to silence during an interview at the Berkshire County House of Corrections ("BCHC"). Realizing

1

suppression of his statements alone would not necessarily ease his predicament, Defendant also posits the government, after the initial visit to the home, unlawfully obtained a search warrant for 158 Second Street entitling him to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and justifying the suppression of all physical evidence seized at 158 Second Street.

A hearing was held, and, for the following reasons, the court denies Defendant's motion in its entirety.[1]

## II. FINDINGS

On February 15, 2022, Lieutenant Forest and Trooper Chalmers, intent on executing a search warrant, led a party of MSP troopers to 160 Second Street.[2] Lieutenant Forest targeted the home because of a tip from the National Center for Missing and Exploited Children ("NCMEC"). NCMEC alerted authorities to three suspicious uploads from a Massachusetts IP address— each depicted child pornography. Based on these tips, troopers tied the IP address to 160 Second Street, the residence of Defendant's mother. After investigating further, troopers learned SnapChat accounts, email addresses, and Kik accounts associated with the unlawful upload bore usernames indicating familial ties to Defendant.

As detailed in the affidavit accompanying the warrant for 160, troopers conducted surveillance of the address. They identified the property as a duplex containing the 160 Second Street address and a separate 158 Second Street address. Visual surveillance confirmed the property had two doors; troopers identified the "northern door" as the entrance to 160 because of corresponding numbers to its left. In contrast, 158's door was demarcated by numbers to its right. Troopers observed Defendant enter 160's door multiple times without a key and accompanied by his daughter. A check of

---

[1] The events underlying this motion were captured by MSP body camera footage and audio recordings which the court was able to review. For this reason, and by agreement of the parties, the September 14, 2023 hearing involved limited testimony by a single witness. Unless otherwise noted, the facts are based on the court's careful review of the search warrants issued for 158/160 Second Street, the video and audio recordings, and the September 14, 2023 hearing before this court.
[2] The court uses the term "troopers" to collectively refer to the MSP team responsible for executing the warrants at 158/160 Second Street.

2

Defendant's criminal records also listed 160 as his home address. Based on this information, Trooper Chalmers sought a search warrant for 160 Second Street "which is occupied by and/or in the possession of: Justin Benoit and/or Susanna Johnson [Defendant's mother])." He also sought a warrant authorizing law enforcement "to search and temporarily seize the person of Justin Benoit if located anywhere in the Commonwealth" and to obtain electronic devices tied to the Defendant.

Upon execution of the warrant on the morning of February 15, 2022, troopers talked with Defendant's mother and learned he lived upstairs in the 158 Second Street unit. Law enforcement also discovered he had access to the password protected WiFi network associated with 160 Second Street. Relying on this new information, several troopers returned to the shared porch containing the door leading to 158. This door had a doorknob and padlock, but neither locking mechanism was in use. It also had space for a deadbolt, but the deadbolt mechanism was removed, leaving a hole in the door through which the interior stairwell was visible. Troopers entered 158's stairwell, climbing up before stopping at the interior threshold to the unit's living area, which was demarcated by a cloth drape. This threshold was designed to have a door hanging which obviously had been removed. Treating this drape like a door, troopers called out to Defendant from the landing, requesting permission to proceed over the threshold. Defendant verbally consented to this entry. After entering, troopers did not handcuff or search Defendant. Instead, they guided him toward his living room couch and requested he sit down. No search of the apartment occurred until a separate warrant issued for 158.

Once in Defendant's living room, Lieutenant Forest and Trooper Chalmers explained they had search warrants for 160 Second Street and Defendant's person. They did not immediately begin questioning Defendant, but rather Lieutenant Forest explained being there because of a cyber tip. Defendant interjected and incriminated himself by admitting receiving files containing child pornography. Lieutenant Forest attempted to stop Defendant from further incriminating himself by cutting him off, but Defendant continued admitting he received unlawful images while disclaiming any knowledge of their preparation, compilation, or dissemination. Lieutenant Forest finally managed to quiet Defendant, he then read Defendant his *Miranda* rights while also relaying he was not under arrest. Defendant stated he understood these rights and wished to proceed with an interview. Troopers

and Defendant went downstairs to the kitchen of his mother's unit. While not in handcuffs, they all went downstairs together. Defendant was not informed he was free to leave. At the kitchen table, Lieutenant Forest and Trooper Chalmers walked Defendant through his internet usage, social media and electronic communication habits, and history of sexual interest in children. Following this line of questioning, Defendant admitted exchanging nude photographs with minors, while also confirming he received child pornography on devices connected to 160's IP address.

Following the interview, Trooper Chalmers sought and obtained a second warrant for the upstairs unit. Executing the second warrant the same afternoon, Troopers located and seized multiple electronic devices, including a Samsung phone and tablet, which were processed on scene by MSP computer experts. In his earlier interview in 160's kitchen, Defendant confirmed these devices were his and he was the only person using them. Forensic examination of the devices uncovered numerous images of child pornography and evidence of the sexual assault of a child. After reviewing these images, troopers determined several incidents occurred inside 158 Second Street, involving a minor child. They subsequently seized clothing and bedding matching those seen in images and videos depicting sexual assaults. Based on this evidence, troopers took Defendant into custody at approximately 4:05 p.m.

After arrest, Defendant was transported to BCHC, where approximately three and a half hours later Trooper Chalmers re-read him his *Miranda* rights prior to conducting an audio recorded interview. After verbally confirming he understood his rights, Trooper Chalmers asked Defendant if he was willing to talk. Defendant paused, but then responded by stating, "I basically already said what I had to say this morning." Trooper Chalmers followed up to confirm his understanding about Defendant wishing to proceed with the interview. Defendant did agree to continue the interview and answer questions, commencing a third thirty-minute interview where Defendant incriminated himself by admitting a years-long sexual interest in children and reiterating he received child pornography from other Kik users. He also told troopers they would find a minimal number of pornographic images on his devices, contradicting the initial results of MSP's forensic examination which located at least 114 images of child pornography. This final interview ended when Defendant stated: "[a]ll I'm going

4

to say is the more I talk, the more it's going to incriminate myself and it's going to put me even longer here." Understanding this as an invocation of his right to silence, Trooper Chalmers ended the interview.

### III.   DISCUSSION

The court will address each of Defendant's arguments in turn.

A. <u>Entry of 158 Second Street with a warrant for 160 Second Street</u>

Defendant contends MSP's entry into his apartment was unlawful. Specifically, he argues by proceeding past the door of 158 Second Street troopers entered a separate dwelling requiring a separate warrant. This argument flows from the general rule "a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Payton v. New York*, 445 U.S. 573, 587-88 (1980). Defendant also claims support from the Fourth Amendment's particularity requirement, which "requires that warrants particularly describ[e] the place to be searched, and the persons or things to be seized." *United States v. Moss*, 936 F.3d 52, 58 (1st Cir. 2019) (internal quotation omitted) (alteration in original). According to this theory, troopers had no lawful right to enter 158's stairwell because their initial warrant only referenced 160 Second Street and the stairwell was not common space rendering Defendant's subsequent incriminating statements inadmissible. The government counters by offering justifications for the troopers' lawful presence in the stairwell, relying on the bedrock presupposition police do not violate the Fourth Amendment solely by entering areas they have a lawful right to be. *See, e.g., I.N.S. v. Delgado*, 466 U.S. 210, 217 n. 5 (1984). First, the government unpersuasively contends the area beyond the door was communal and thus no warrant was needed.[3] The government also

---

[3] The stairwell is not a communal hall in a multistory building or a shared foyer in a smaller building. It leads only to 158 from the front porch and is not accessible from the interior of 160. Body camera footage shows a padlock, separate numbering, and 158 is the only unit on the second floor meaning the space is not "communal" in the sense usually referenced in the case law. This reasoning is in-line with decisions by other sessions of this court. *See, e.g., United States v. Pimentel,* No. CR 18-10452-PBS, 2019 WL 3767514, at *6-7 (D. Mass. Aug. 9, 2019), *aff'd*, 26 F.4th 86 (1st Cir. 2022)(finding second and third floor apartments distinct, but upholding the search of the incorrectly identified apartment relying on the good faith exception).

5

argues the good faith exception should apply because law enforcement's actions, even if formally violating the Fourth Amendment, were "objectively reasonable" making application of the exclusionary rule unwarranted. *See United States v. Leon*, 468 U.S. 897, 918-20 (1984).

Implicit in Defendant's argument is the assumption a warrant which incorrectly lists the address being searched is facially invalid. This is not necessarily correct. In *United States v. Woodbury*, the First Circuit reviewed a warrant correctly identifying the defendant but incorrectly identifying his apartment. 511 F.3d 93, 95 (1st Cir. 2007). The court upheld the validity of the subsequent search, explaining, "[w]e cannot say that the search warrant for Woodbury's apartment was so facially deficient that it failed the standard outlined in *Leon* and as applied by this Court…[t]hough listing the wrong unit, the warrant made clear reference to the apartment occupied by Woodbury." *Id.* at 100. The *Woodbury* decision relied on a foundational principle: particularity can be found when the warrant names the person whose unit will be searched. *See id.* at 101 (Boudin, C.J., concurring) (citing *United States v. Bedford*, 519 F.2d 650, 655 (3d Cir. 1975)); *accord United States v. Vaughn*, 875 F. Supp. 36, 42-43 (D. Mass. 1995) (finding name of occupant sufficient); 2 Wayne R. LaFave, SEARCH AND SEIZURE § 4.5(b) (6th ed., 2022) ("A subunit may be sufficiently designated by the name of the occupant"). The principle may hold true when the listed address is incorrect but on the same street, *see United States v. Lora-Solano*, 330 F.3d 1288, 1293-94 (10th Cir. 2003), and when the same building has multiple addresses, *see Steele v. United States*, 267 U.S. 498, 502-03 (1925).

The reasonableness of officers' reliance on the warrant depends on the factual circumstances of the case. In *United States v. Pimentel*, when reviewing a warrant correctly identifying the defendant but failing to identify the proper subunit, the First Circuit engaged in a review of the circumstances of the warrant's execution before concluding the police actions were reasonable. 26 F.4th 86, 92 (1st Cir. 2022). In determining officers acted with objective reasonableness, the court found salient the fact the home was occupied entirely by members of defendant's family. *Id.* at 88-89, 93. Also relevant, officers learning of the factual mistake while executing the warrant and information at the scene indicating the contraband sought was in the unit not listed on the warrant. *Id.* at 94, 96. These considerations mesh, both with *Woodbury*'s focus on the independent source of the new information leading to the correct

unit, and its emphasis that police refusal to search the apartment of unintended persons favors a finding of good faith, to guide the court's analysis. 511 F.3d at 99-100.

Applying *Woodbury* and *Pimentel*, the court concludes troopers' decision to enter 158 Second Street was objectively reasonable. At the time troopers proceeded through 158's threshold there existed a reasonable basis to seek out Defendant's actual unit. This was grounded in the pre-execution surveillance indicating Defendant freely entered the 160 unit with his child, as well as a query of his criminal records listing 160 as his residence. Reasonably relying on the information available, troopers sought a warrant naming 160, wrongly but specifically identified as Defendant's unit, as the place to be searched. During the execution of the warrant, troopers learned from an independent source (Defendant's mother) the person and contraband sought were in the upstairs 158 apartment. Their warrant allowed them to enter Defendant's unit, as they proceeded into the stairwell. *Woodbury*, 511 F.3d at 99-100. Mitigating any constitutional harm, here, as in *Pimentel*, the entire structure was occupied by Defendant or members of his family— also targets of the underlying warrant— so troopers did not enter any apartment not reasonably believed covered by the warrant. 26 F.4th at 95-96. In a further sign of good faith, once they reached the interior entry to the apartment, they stopped and obtained consent to enter, before ultimately securing a second warrant to search the interior of 158.

Troopers had an alternate good-faith basis for the initial entry into 158's stairwell. The Fourth Amendment does not prevent officers from approaching a residence to interview the inhabitants. *See United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990). This approach is referred to as a "knock-and-talk," and to carry out a "knock-and-talk" officers may approach the dwelling by any means an individual with an implied license to visit would use. *See Florida v. Jardines*, 569 U.S. 1, 7-9 (2013). In determining the contours of a permissible knock-and-talk, the First Circuit's decision in *United States v. Perez-Diaz* is instructive. 848 F.3d 33 (1st Cir. 2017). There, FBI agents approached defendant's apartment by passing through a back gate with a padlock affixed. *Id.* at 39. The First Circuit concluded this behavior did not violate any Fourth Amendment interest because the agents did not use force to

enter, nor did they stop to search the area. *Id.* The agents "did not violate the curtilage of Pérez's home by opening the back gate or by merely walking from the back gate to the front door." *Id.*

The result was similar here. Troopers believed the door led to a stairwell which they necessarily had to traverse to reach a door to an apartment for a knock-and-talk. Troopers' behavior, as captured by body camera footage, also indicated this goal. They halted at the top of the stairs, and while they could not knock because the entrance lacked a door, they called out to Defendant. Only when they received verbal permission did they enter 158's living area. At no point did they search the stairwell. Viewed in context, the initial entry was an objectively reasonable attempt at a knock-and-talk. Defendant fails to demonstrate opening 158's outer front porch door was unlawful.

B. *Miranda* Violation

Defendant has no supportable claim he was subject to a custodial interrogation at 158/160 Second Street. "Custodial interrogation requires that the defendant was both 'in custody' and subjected to 'interrogation.'" *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2008) (internal citation omitted).

As to the first requirement, Defendant was not in custody when interviewed by troopers at either 158/160 Second Street.[4] A two-step inquiry guides the custody analysis. "First, it must be determined whether, based on the objective circumstances surrounding the interrogation, a reasonable person would have felt free to terminate the interrogation and leave." *United States v. Monson*, 72 F.4th 1, 10 (1st Cir. 2023). "Second, if it is determined that a reasonable person would not feel free to do so, it must then be determined whether the environment in which the interrogation occurred 'present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *Id.* (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). The First Circuit has identified several factors relevant when assessing custody, including: "the setting of the interrogation, 'the number of

---

[4] Defendant's interactions with police occurred both upstairs in 158 and downstairs in 160. Based on careful review of the body camera footage, the court concludes these interactions constituted one ongoing interview. This interview began in 158's living room, paused briefly while moving downstairs to 160, and concluded in 160's kitchen.

law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" *Id.* (quoting *United States v. Swan*, 842 F.3d 28, 31 (1st Cir. 2016)). These factors are not exhaustive, consequently a finding of custody must be based on the totality of the circumstances. *Id.*

Based on a careful review of the circumstances present here, the court concludes a reasonable person would have felt free to terminate the interview. Troopers spoke with Defendant in the familiar settings of his living room and mother's kitchen. *See, e.g., United States v. Campbell,* 741 F.3d 251, 267 (1st Cir. 2013) (noting neutral location weighs against finding of custody); *United States v. Ashworth*, -- F. Supp.3d--, No. CR 19-10477-MLW, 2023 WL 3984949, at *6 (D. Mass. June 13, 2023) (questioning in defendant's apartment weighs against custody). While multiple troopers and support personnel participated in executing the warrant, only two, Lieutenant Forest and Trooper Chalmers, directly communicated with Defendant. *See, e.g., United States v. Crooker*, 688 F.3d 1, 12 (1st Cir. 2012) (finding no custody when "numerous officers" took part in the warrant's execution, but "no more than two agents were in direct conversation with [Defendant]."). While he was not informed of being free to leave, Defendant was not handcuffed, *see Monson*, 72 F.4th at 11-12, nor did the combined interaction last more than approximately forty-five minutes, *see id.* at 12 (finding interview time of one-hour weighs against custody). The court considers several additional factors in its analysis, including Lieutenant Forest informing Defendant he was not under arrest, the interview occurring just before noon and not in the early hours of the morning or late at night, and law enforcement keeping their firearms holstered throughout. *See id.* at 13. Reviewed in context, these factors all weigh against a finding of custody.

However, even assuming Defendant was in custody for purposes of *Miranda*, Defendant's initial interaction in the 158 unit with police was not an interrogation thereby failing the second prong of custodial interrogation analysis. *See, e.g., United States v. Conley*, 156 F.3d 78, 82-84 (1st Cir. 1998)

9

(refusing to suppress spontaneous utterances made in response to factual narrative by police). These pre-*Miranda* statements at 158 were not prompted by direct police questioning, nor were they in response to any actions "police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Sanchez*, 817 F.3d 38, 44 (1st Cir. 2016) (internal quotation omitted). The trooper's comments were "not worded in a particularly confrontational manner," they "did not directly accuse" Defendant of a crime, nor did they "seek to inflame his conscience." *United States v. Genao*, 281 F.3d 305, 311 (1st Cir. 2002). Defendant's decision to reply by incriminating himself was spontaneous, and "[t]he Constitution guards against compulsion by the state, not poor decision-making by defendants." *United States v. Rang*, 919 F.3d 113, 120 (1st Cir. 2019).

After making the initial incriminating statements upstairs at 158, Defendant was read his *Miranda* rights and agreed to proceed with the interview downstairs in the kitchen of 160. These post-*Miranda* statements at 160 Second Street were the product of valid waiver. A valid waiver of *Miranda* rights must be made knowingly and voluntarily based on the totality of the circumstances, which means the waiver was the "product of a free and deliberate choice rather than intimidation, coercion and deception," *United States v. Sweeney*, 887 F.3d 529, 536 (1st Cir. 2018) (internal quotation omitted), and made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon," *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (internal quotation omitted). The government bears the burden of demonstrating waiver by a preponderance of the evidence. *Id.*

Defendant challenges the voluntariness of his waiver on two fronts— unlawful coercion and deliberate misrepresentation. Neither conduct was present in the kitchen of 160. The troopers' behavior was not coercive, nor did they resort to threats or profanity. Defendant was not physically restrained. In terms of length, the interview time was reasonable— roughly thirty minutes— and it was not marred by the refusal of any essentials. It was conducted in Defendant's mother's kitchen,

10

not at the station house. Defendant's demeanor did not become phrenetic or indicative of a weakened mental state. Defendant has failed to demonstrate conduct amounting to unlawful coercion. As a last resort, Defendant claims troopers misrepresented their right to enter Defendant's apartment. But they did not misrepresent any authority because they had a good-faith basis to enter 158's stairwell, and they accurately stated they had a warrant for Defendant's person.

Defendant's waiver was also made knowingly. He stated he understood his rights and wished to proceed. Throughout the course of the interview, Defendant demonstrated he could understand and respond to relatively complex lines of questioning, he understood actions have consequences, and generally did not behave like he was unable to grasp what was occurring. *See Rang*, 919 F.3d at 119. Moreover, Defendant "was hardly a neophyte in the criminal justice system," and prior exposure to the criminal justice system weighs in favor of finding knowing waiver. *United States v. Rojas-Tapia*, 446 F.3d 1, 8 (1st Cir. 2006). Based on the totality of the circumstances, Defendant understood his rights and affirmatively waived them.

Finally, Defendant asserts he unambiguously exercised his right to silence at BCHC. The First Circuit and other sessions of this court have refused to find statements ranging from "[I have] nothing to say" to "I just want to be quiet" unambiguous invocations of the right. *United States v. Simpkins*, 978 F.3d 1, 12 (1st Cir. 2020) (the former); *United States v. Grubert*, 605 F. Supp. 3d 171, 177 (D. Mass. 2022) (the later). Defendant points to one statement: "I basically already said what I had to say this morning." This statement is more susceptible to multiple constructions than the statements in *Simpkins* or *Grubert*. Given the inherent ambiguity of a statement susceptible to multiple reasonable constructions, the court concludes this was not an invocation of Defendant's right to silence. The court's conclusion is supported by the remainder of the audiotape. Trooper Chalmers followed up to clarify the ambiguity and secured affirmative consent to continue the interview. When Defendant did

invoke his rights, troopers scrupulously adhered to his request. The totality of the surrounding circumstances do not support Defendant's position he unambiguously asserted his right to remain silent.

Defendant's motion to suppress the 158, 160, and BCHC statements is denied.

C. <u>Franks Hearing</u>

Nor has Defendant established he is entitled to an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). "Under *Franks*, 438 U.S. at 155, a defendant may request an evidentiary hearing to challenge the truthfulness of statements made by law enforcement agents in a search warrant affidavit." *United States v. Hicks*, 575 F.3d 130, 138 (1st Cir. 2009). "To obtain a *Franks* hearing, a defendant must make 'a substantial preliminary showing' that: 1) the warrant affidavit contains a false statement made 'knowingly and intentionally, or with reckless disregard for the truth,' and 2) that 'the allegedly false statement was necessary to the finding of probable cause.'" *Id.* (quoting *Franks*, 438 U.S. at 155-56) (internal citations omitted).

Defendant has failed to meet the high bar necessary to justify a *Franks* hearing. Though the government concedes the statement officers "knocked" before entering the front porch door is incorrect and should not have been included in the affidavit for 158 Second Street, the court concludes this statement would not affect the probable cause analysis. *Cf. United States v. Congo*, 21 F.4th 29, 35 (1st Cir. 2021); *see generally Hudson v. Michigan*, 547 U.S. 586 (2006) (violation of the knock-and-announce rule does not warrant suppression of evidence). The other statements challenged by Defendant are not false statements. It is clear troopers knocked and announced themselves before entering the interior threshold to the actual living space at 158, showed Defendant the search warrant for his person, and explained to him why they had obtained a warrant. Defendant voluntarily stepped back into the kitchen from the entryway to allow officers to enter after verbally confirming they could enter and sat on the couch of his own accord. Likewise, the affiant's characterization of Defendant's

statements as voluntary does not constitute a false statement. Indeed, when Defendant began incriminating himself, troopers stopped him, finished explaining the basis for the warrant, read him his *Miranda* warnings, and emphasized Defendant was not under arrest. Defendant indicated he understood his rights and wanted to talk. Based on the body camera footage, none of these statements by the affiant were false.

Nevertheless, even if the court were to conclude Defendant made a substantial showing the statements were false and made intentionally or recklessly, none of the statements are necessary to the finding of probable cause. Excluding each of the challenged statements—and, in turn, all the statements Defendant made to officers—the court finds probable cause would still exist for 158 Second Street based on the reformed affidavit. The affidavit attached and incorporated by reference the prior affidavit for 160 Second Street, detailing numerous tips relating to child pornography uploaded by SnapChat usernames indicating familial ties to Defendant and his IP address. Defendant's mother confirmed he used the IP address despite living in the upstairs unit. That information (which is not challenged by Defendant), combined with the search warrant affidavit for 160 Second Street, is sufficient to establish probable cause to search 158 Second Street. Thus, Defendant has not made a substantial preliminary showing the allegedly false statements were "necessary to the finding of probable cause." *Hicks*, 575 F.3d at 138. Accordingly, Defendant's request for a *Franks* hearing is denied.

IV.     CONCLUSION

For the foregoing reasons, the court DENIES Defendant's Motion to Suppress (Dkt. No. 47).

It is So Ordered.

      /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge